We have a quite full calendar this morning, so we will dispense with a full reading of the calendar, and Ms. McKee, you may call our first case. First case of the day, case number 24-1217 from South Dakota, Curtis Temple v. Lawrence Ms. Hagee, you may come forward and proceed when you're ready. Thank you, Your Honor. May it please the Court, Counsel. Livestock and land, two things that are at the heart of every ranch operation. A third-generation rancher from the Pine Ridge Indian Reservation, Curtis Temple has had both of those taken away from him without any meaningful recourse or an opportunity to be heard. There are two primary issues in this case. The first is centered upon the Bureau of Indian Affairs' procedural deficiencies in its oversight and application of the federal BIA grazing permit regulations. The BIA violated Temple's procedural due process rights when failing to provide Temple with a meaningful opportunity to be heard relating to its seizure of over 360 head of Temple's  Importantly, no actions by Temple excuse this lack of procedural due process that has been affected upon him. The second primary issue in this case is the district court's dismissal of Mr. Temple's pre-impoundment claims relating to the issuance of the grazing permits to another individual despite Mr. Temple's preferential status. Two issues that are interrelated to those primary issues are the court's quashing of two subpoenas of tribal employees and the court's denial of Temple's unopposed motion to continue its trial date. The brief factual history doesn't do justice for the hoops that Temple has jumped through in order to get here today. Did he jump through hoops? I mean, one of the things that I look at is in the procedural history, he had multiple opportunities to submit written objections. And basically, from my read of the record, and you can correct me, he ignored all but one chance. And so, it doesn't seem like if he had hoops to jump through, it seems like he didn't really jump through them. He did respond to one of those, at least one of those requests for that opportunity to respond to the notice of trespass itself. But the basis of the due process claim here is that notice, that opportunity to respond at that time isn't sufficient to satisfy the procedural due process that he is entitled to. But doesn't he have some responsibility, though? I mean, I think there were four or five occasions at each time, maybe I'm wrong about this, there's at least three, where they sent him a notice and he basically ignored them, from what I can tell. He ignored them, continued to graze on the property, rightly or wrongly, I'm not debating that now, but he ignored it. And so, it kind of falls flat to say that I didn't get due process when you didn't avail yourself of the process that you were actually given. How many notices were there? How many notices were sent to him? I believe there were several notices. Those are several. How many? What several? I believe, I believe the district court may have indicated that 20 unofficial or official notices had been sent to him during the course of this proceeding. In addition to those notices, though. If you just look at that, isn't that, I mean, it's almost a staggering number of notices. I mean, how many times does a person have to receive a notice before they pay attention to what's in them? Your Honor, I would submit that Mr. Temple was paying attention. He was taking action, aside from responding to the formal notice itself. He was appealing to the Tribal Executive Committee, which then, he had three separate lawsuits going in the tribal court. He appealed to the BIA Regional Director, and then to the IBIA. He filed federal court cases. He was another proceeding. He was criminally indicted for this. The notices say, I think, I've got a note here, the notice advised him that he could contact the BIA in writing to explain why the trespass notice is in error, right? Correct, Your Honor. Did he do that? He did that at least in one instance. But going back to the basis for the due process claim, is that process, that opportunity to respond, afforded to him at that point, regardless of whether he responded or not, that process is insufficient to satisfy the due process. I just wonder if that's Monday morning quarterbacking, because, to use an analogy here, because if he didn't respond to the simple act of 20 notices, I didn't even realize it was that many, 20 notices, what's to say that if he would have been given a hearing, that he would have shown up and complied with those processes? Usually when you see a due process claim, you see a consistent effort to comply with the process that was due. Here we got none of that. We've just got, I wanted more, without complying with what you actually got. The issue here is what he actually got wasn't enough. Under the, I would point you to the Hudson versus Palmer case, which is cited in our reply brief, that's what we're dealing with here. There isn't a meaningful opportunity to be heard until the seizure has actually taken place. What would a meaningful opportunity be in your client's eyes? I don't believe that the court necessarily has to go that far and set what a meaningful opportunity to be heard would look like. I think perhaps it would look like an opportunity to address the seizure and the factual circumstances underlying that seizure after the cattle are impounded, yet before they are sold to a third party or before he is assessed fines and penalties and the opportunity to pay those in order to redeem his cattle. So he's not complaining about the process, the letters? In other words, you're talking about after the impoundment, right? And the letters were coming before saying, hey, looks like there's a trespass here. This is what's going to happen. So where in the line is he saying he needed more process? You're saying after impound, but you're not arguing there should have been more before? I don't believe the pre-deprivation process that was afforded to him is sufficient when you look at the three factors set forth in the Matthews versus Eldredge case. When you look at the private interest at stake here, which is a rancher's livelihood, 360 head of cattle, a fine assessment of over $600,000, that isn't sufficient. I'm going to take you to task on that. Suppose you're a Amazon delivery driver, and you park in a no-parking zone, and the city tows your car away. Do you get a pre-deprivation hearing on the street right next to as the tow truck or meter person tows your car away? No, you don't. That's his livelihood. I mean, he needs his Amazon delivery truck, and you're impounding it. You're impounding his vehicle. So what's different about this case? I think that's pretty close to along the same lines, and that is why I think in that situation, it's common to see a post-deprivation hearing addressing that impoundment. Here you have the same situation where regardless of whether the notice pre-deprivation was sufficient, he couldn't actually raise certain points, raise certain allegations because the seizure hadn't occurred. In this situation, there was an admittedly one of the livestock was brought to the BIA officials during the impoundment without any confirmation of whose property that cow came from, if it was actually in trespass or not. Those circumstances aren't known and can't be refuted when the notice is provided two or three months before the seizure. I would give you a similar analogy where you're parked in a city parking lot, and the city says, here's your notice. You can't park in this parking lot. Nine months later, I go and I park across the street, just along the street. Not in the parking lot. City comes and impounds my car. In that situation, with this pre-deprivation notice, I wouldn't have had the opportunity. I wouldn't have known that they're going to come over here and seize my car that's not even subject or in the parking lot itself. I want to be able to raise that defense that, hey, my car isn't even in the parking lot, wasn't even in the area. It wasn't in trespass. In order to have a meaningful opportunity to be heard, I need to be able to raise those defenses at that time. That's usually a post, even under your example, that's usually a post-deprivation hearing. I think as I look at this more, normally for due process, you're thinking pre-deprivation is ideal. That's what you need. That's most protective of your rights. This is one of the situations where I think that's not practical because of the limitations it puts on the property owner under the Hudson versus Palmer analysis where these seizures are subject to random conduct and you don't know the circumstances until the property has actually been seized. Is what you're saying that the cattle and their location as of the time of the notice is not necessarily the same as the cattle and their location at the time of the impoundment? Correct. This is in a situation where you have the notice of trespass. The BIA goes in and corrals the cattle that they're alleging to be in trespass. They do this notice and then the cattle are free to roam. They cross. There's no property line that they stay within. They can cross wherever. In this situation, there was testimony about the fencing surrounding the range unit not being in good condition. That was noted repeatedly in the BIA reports and compliance checks. In that situation, for Mr. Temple to have a meaningful opportunity to be heard, he should be able to have the chance to go in and raise these issues. What about at the notice? Would that not be an opportunity to say, all right, well, which ones are you talking about? What are the lines between properties that you're identifying so that I can understand exactly what you're saying? Why wouldn't that have been a point at which to clarify some of the concerns that you're raising that your client may have had at the time of the impoundment? Because it still doesn't give you the opportunity to know the exact circumstances, the exact cattle seized, where those are coming from at that moment of impoundment. You only know that at that moment when the BIA is out there impounding these cattle. They're making the decision right then and there that, okay, this cattle, this cow is in trespass, I'm going to impound it. This cow is not in trespass, I'm going to let that one go. These aren't going to be the same cattle that perhaps were subject to the formal, the earlier notice of trespass. And I think you see that in the numbers or the notices that the numbers are changing. These cattle are moving. And I think here, he was sufficiently or extensively deprived of that opportunity because as the court hearing played out in August of 2023, there were the fencing issues. Mr. Temple had property immediately outside the boundaries of these range units. The fencing was deficient. The regional director himself, I believe, testified that that inadequate fencing would have been a violation of the permit holder and not Mr. Temple's responsibility to repair that fence that's surrounding the boundary, exterior boundary of the unit. I hear you saying that, as a factual matter, that the appellant's cattle, some of the appellant's not trespassing. Is that what you're saying? Yes, Your Honor. The district court made a factual finding that the BIA was, quote, extremely careful only to impound trespassing cattle. So you take issue with that factual finding? I do in a sense of, you do have that testimony. And so then, if you do, what's the evidence that supports your factual contention? So I think it was unrefuted at the trial that, as a great example, one of these ranchers, and I believe it was perhaps a relative even of the permit holder himself, brought a cow to the BIA and said this was on his property. The BIA had no indication at that time. They admitted it. They had no indication at that time of where that cow came from. But I think, despite that issue, you still have to look at the procedural due process that the BIA provided here. Can you answer the question? What is the evidence, factual evidence, that the BIA was not extremely careful only to impound trespassing cattle? Is it that incident that you refer to? Is that it? That would be one. I think when you have a hearing eight years after the fact, you lose that opportunity to know what actually transpired that day. And I think you see that throughout the testimony of the individuals, the, I don't remember, I don't recall. And here, the focus is on the BIA's process. You're not going to answer that question, are you? Is there some evidence that the BIA was not extremely careful only to impound trespassing cattle? I, other than the one cow that came in, I think they testified that they were extremely careful in doing so. Was that cow impounded? Yes, Your Honor. But, aside from the factual circumstances, it's still apparent that that procedural due process was not afforded to Mr. Temple. It needed to be provided to him earlier than eight years after the fact. And the fact that it just happened one year ago, eight years after the impoundment, that is not procedural due process. That is not an opportunity to be heard at a meaningful time and in a meaningful manner. What about, I just want to ask one additional question. What about the fact that he didn't actually have to exhaust the remedies according to the district court? I think that's important because it's really hard to complain about a lack of procedural due process, which I think I hear your eight years being about the IBIA and some of those, when you didn't have to do that in the first place. And so, he presumably, at least according to the district court, could have immediately gone to court or very shortly thereafter gone to court and filed the same action he did here. Your Honor, I think there's two questions here. What could Curtis have done versus what did the BIA offer? What were their procedures that they put in place to ensure that due process had been given? So, aside from what Curtis had done, the BIA's process is constitutionally lacking. But going back to what Curtis could have done if he should have pursued that at that time that Judge Viken made that determination, I would point you to document 183 where Judge Viken did say the IBIA should hear, perhaps needed to exhaust the topic of the assessment of penalties. And so, it's a situation where he hadn't conclusively ruled that none of these claims could go forward until the IBIA heard this matter. But that part of it needed to be going over here, and while some of it could be going over here, it just seemed to develop that record in its entirety to pursue that through the IBIA. In addition, you have the concern here where everyone is pointing the finger at, oh, you should have done this, and you needed to do this in tribal court. You needed to do this in the IBIA court. You needed to do this in federal court. And with that constant shifting and pointing to different jurisdictions, I think there's the concern that if you don't do that, is it going to come back and hurt you and be used against you at the end of the day? One last question, and I'm sorry if I'm using up your rebuttal, but on the sovereign immunity, the tribal immunity, do you agree that de jure-ty controls our de jure-ty case, or do you take a position different than that? De jure-ty is good law. I think perhaps it's more of an exception that needs to be made in this situation where you have, and certainly not wanting to downplay or undercut tribal sovereignty and their right to self-government, but here you have this situation where these tribal employees are acting under the guise of a federal regulatory scheme. They're doing this under the direction and ultimate authority of the federal, the BIA, and so that pushes them more towards the federal aspect versus the aspect of self-government and tribal sovereignty. Is that issue, what does that issue go to? Which claim is, if you aren't successful on all of the claims, is there a chance that that one is mooted out? That it would be interrelated to the claim that Mr. Temple should have had the opportunity to address the pre-impoundment claims, the issuance of the grazing permit, because the information that was subpoenaed for, under that subpoena, was relating to the tribe's process and selection of the other permittee. So that argument rises and falls on basically what I'll call the exhaustion issue. That's correct, Your Honor. Thank you. I'll reserve my time for rebuttal. Sure. Thank you. All right. Let's see. Who will go first? Mr. Arbab? Yes, Your Honor. John Arbab for the Federal. Proceed when you're ready. John Arbab for the Federal Appellees. With me at council table is Steve Gund, who will be arguing for five minutes on behalf of the tribe. Your Honors, Mr. Temple had repeated meaningful opportunities provided by the BIA regulations to show cause why his cattle were not in trespass on these two range units, such that the BIA should withdraw the trespass notices. This opportunity arose some 20 times, once after each trespass notice was issued to the plaintiff, and this all happened before any cattle were impounded. Mr. Temple, though, just didn't avail himself of the 20 opportunities to show cause why there was something wrong with the trespass notice. The one time he did respond to the BIA superintendent, the superintendent considered his arguments and issued a written decision saying why those reasons weren't sufficient to withdraw the trespass notice. That is a meaningful opportunity to be heard. What about the hearing, though? I mean, I got to say that the amount of time, I understand you can argue he didn't have to exhaust it, but that is abysmal to wait three or four years for an answer on a dispute like this. I don't know if the agency is overworked. I don't know if the court is, you know, if the ALJs are overworked or whoever staffs those, but that is just abysmal. Your Honor, the BIA superintendent's response to the one notice, trespass notice that Temple responded to occurred very quickly. It did, but then the administrative appeal ended up going very slowly, and I think that's what I'm getting at. Your Honor, no, that is an important consideration that I don't think came out in the opening argument, which is that Temple took an appeal to the IBIA from the BIA superintendent's decision to issue the permits to Buffington rather than to himself, but he voluntarily dismissed that IBIA appeal. He got a decision, an adverse decision on that topic from the regional director promptly, and then he noticed an appeal. So, which was the one that took a little while? There was an IBIA that took three or four years. I don't think that ever gave him an answer. Was that not an administrative appeal from the superintendent's decision? No, that was a separate later decision attempting to appeal the notices of impoundment that were issued later, and the regional director promptly, Temple took an appeal to the regional director who promptly issued a decision explaining why those administrative appeals were not timely and when they would be, excuse me, ripe, and when they would be ripe. But instead of filing a notice, an administrative appeal at the point of ripeness, Temple persisted in appealing to the IBIA from the decision that the regional director had said was not ripe yet for review. That's the one that got hung up for the long period of time. But really the, kind of the crux of this, there's been two defenses that Temple has raised. The primary one is that the BIA should not have allocated, should not have given, granted the grazing permit to Mr. Buffington, the other tribal member. I should have been given the permit, and if I had been, if the BIA had given the permit, then, of course, my cattle could not have been grazing in trespass. This is the very claim that I just was discussing with Judge Strauss. This was the administrative claim that was rejected promptly by the BIA superintendent in 2013, I believe. Yes, the BIA superintendent issued the permit to Buffington March 25, 2013. Temple took an administrative appeal very promptly, well, five months later, roughly, August 16 of 2013. The regional director denied that appeal. Temple noticed an appeal in September of 2013, but then, to the IBIA, but then voluntarily dismissed it in May of 2015. So he had, in addition to all of the pre-impoundment notices and opportunities to be heard, he had this additional one that came later in the process, and he voluntarily dismissed that administrative appeal. On top of all of this, no cattle were sold or offered for sale by the BIA until the plaintiff had voluntarily dismissed the appeal I was just discussing, and until after the district court had denied multiple TROs from Mr. Temple seeking to block the sales. So as I hear Counsel for Temple arguing that, okay, so there's a notice that you're going to, that at point A, time point A, these cattle we believe are in trespass. You have a chance to respond to that, but then once you actually get to the point B in time, cattle have moved around, and it may not be the same set of facts as I got notice of before. Can you respond to that, what kind of opportunity Mr. Temple would have had to say, wait a minute, now my cattle are in different places, whatever I might have responded to the first time, it's just not the same set of circumstances. Is that a realistic possibility? I don't really think so, because we do have the factual findings from the district court. And I understand that, I'm sorry to interrupt you, I understand the factual findings, but just as a sort of stepping back and going back in time in that moment, would that have been a possible problem? I don't think that that is borne out on this record, Your Honor. There were some 20 compliance checks, each one was documented, which cattle, they were Temple's cattle, because the compliance checks verified that his brand was on these cattle. And those compliance checks then come after the notice, so the notice is given and then there are compliance checks subsequent to that? The compliance checks come first. And that is the basis for the determination that these cattle appear to be in trespass. And then subsequently the trespass notice is issued to Temple. So there's been a pattern of the same cattle being in trespass through the course of these compliance checks and then the notice issues? Yes, Your Honor. In the record you can see not all of the documentation of the compliance checks, but a lot of them, and they're very thorough. And there were at least 20 compliance checks. And so over a period of time you have Temple's cattle grazing on these two range units, 169 and P501, for which he does not hold a permit. Mr. Buffington held the permit, and as a practical matter, as the district court found later, Temple's trespass grazing effectively ousted Buffington from the range units to which he, on paper, held a lawful permit. So Buffington couldn't use these range units during the time that Temple's cattle were illegally grazing thereon. And when these compliance checks were conducted and an apparently trespassing cow or cattle was found, the brands don't match, for example, were they impounded at that point and then a notice was sent, and a notice would be sent in this case to Mr. Temple? Is that how it works? Yes, Your Honor. There were two impoundments. The first impoundment. Listen, when I heard counsel describe this, it sounded like they do the compliance check, they find the trespassing cattle, they leave them, they send a notice, and in the meantime, the cattle can move around to other areas. Well, that might be. Is that the way it works? That might be, Your Honor. But as I was saying, there were some 20 compliance checks. So over a long period of time, you have confirmation that this wasn't just like aberrational behavior or, you know, wandering cattle. Mr. Temple didn't have a permit. He didn't have a permit for any of this area in these two range units. And the district court, the BIA had told, very early on had told Temple, you're claiming to own some of the land in these range units, and you don't own thousands of acres, you own a couple hundred acres, at least you have a part interest. And there's a mechanism for removing these parcels from the range units. Here's what you need to do. But Temple never did that. And the district court found that Temple never did that. He tried to claim at trial later that, oh, yes, I initiated the process, and the BIA took the parcels in which I had an interest, took them out of the range units, and therefore my cattle on those range units couldn't have been grazing in trespass. Well, the district court made findings that, no, you never invoke the process. And during the relevant times here in 2015 and 2016, the parcels in these range units that Temple had an ownership interest in were still in the range units. So he hadn't taken them out. And that even if he had taken them out, which he hadn't, he would have had to fence his parcels off so that his cattle, if he put them on the units that he had an interest in that were now not in the range units, he had to fence those. Was that his responsibility to fence it, or was that somebody else's? You heard opposing counsel suggested it was somebody else's responsibility. No, the court and also the BIA found that this responsibility would be Temple's, because if he had taken his parcels out of the range units, it would be incumbent upon him to make sure that his cattle stayed on those parcels that had been taken out of the range units. And the way you do that is by erecting a fence. And I think early on, the superintendent even told Temple exactly what type of fencing this had to be. Very specifically, barbed wire, three-wire barbed wire fencing. I mean, it was just very well known to him what he needed to do, and he didn't do any of it. He didn't take the parcels out, and he didn't fence the parcels that he maybe believed he had taken out of the range units. There was really no excuse for his cattle wandering anywhere. It was his responsibility. And if Buffington had not been ousted, if Temple had not been, as the district court said, nothing but a holdover tenant, it would have been Buffington's responsibility to maintain the exterior fencing around these two range units. But Buffington was ousted from use of the range units because of Temple's behavior. It's sort of, you know, it takes a lot of nerve, I think, to say, oh, no, you should have maintained the fencing, but I couldn't have because I was ousted by you from the range units. Well, I just want to follow up, because I think it's actually, it seems to be an important point, and I'm not really hearing kind of a straight answer. When trespassing cattle were found by the BIA, were they then, was it then, were the heads of cattle then impounded? Or did the BIA go back later and find the cattle wherever they may have roamed and then take possession of them? They were impounded later. They were impounded, the first impoundment was in August 19, 2015. The second impoundment was June 21 of 2016. And this was after many trespass notices had been issued. So the notice, the trespass notice is not giving notice to Mr. Temple that particular heads of cattle were trespassing. It was just a notice that your cattle is trespassing. No, Your Honor, I think if you look in the record, there's some examples of the actual trespass notices, and they're very specific about what cattle, where exactly they were found in trespass and so on. And so if Temple thought, oh, you're talking about, you know, Parcel X, but I own Parcel X, so I couldn't have been in trespass, he should have come, he should have responded right away, as he was invited to do, to show cause why those cattle were not in trespass. Well, it's because I own Parcel X, but he never did anything like that. I hate to belabor it, I know cattle are branded, but they don't have serial numbers on them, do they? Well, the brands are unique. There's a whole brand book system in South Dakota. I think it's a matter of public record, so there's even the diagrams of Temple-specific brands, and that they were found on these cattle. Right, but not a head of cattle-specific brand, right? Well, it's specific to Temple, so any cow with this brand is Temple's cow. What I'm trying to learn about the facts is when cattle were found by the BIA to be trespassing, did they just let those cattle continue to roam while they notified Mr. Temple with a violation notice? Yes, Your Honor, they were not impounded until later, and I think the reason for that is they Well, I heard counsel to say that then what would happen is the cattle would roam into an area where they were legally permitted to be, and that the BIA would take possession of them there. And they were no longer trespassing. That's not what happened, and the district court, as came out earlier, made a specific finding that using GPS, the BIA, when they did do the impoundments, were careful only to round up to impound cattle that could not arguably be on any parcels that the plaintiff had an ownership in. So it's not necessarily the exact same cows that were trespassing, at the time of the notice, that are actually impounded at the time of impoundment, right? That's correct, Your Honor. But what you're saying is that, if I'm understanding, as the district court found, the ones that were impounded were at that time of impoundment trespassing? Yes. So even if they hadn't, you know, cow Bessie had not been trespassing at the time of notice, but Bessie is at the time of impoundment. She's the one that's going to be taken. Yes, that's how I understand the process worked. And it may have been many of the same cows in both instances. But the important fact is that the BIA did not impound any cattle that were even arguably on property that Temple was claiming some ownership interest in. I see I've gone way over my time. Mr. Gunn. Thank you, and may it please the Court. This is a tribe whose reserved its original inherent right to self-government in two treaties with the United States, the Treaty of 1851 and 1868, among others. The tribe has an interest in the effective management of grazing lands on the Pine Ridge Indian Reservation. This is a tribe whose membership exceeds 50,000 and whose reservation is over 3 million acres. The district court correctly noted that grazing land is one of the most valuable assets of the tribe. Congress, when it passed the American Indian Agricultural Resources Management Act in 1993, declared that Indian agricultural lands are renewable, manageable natural resources that are vital to the economic, social, and cultural welfare of many Indian tribes and their members. Part of the effective management of grazing lands is swift remedy to trespassing cattle. Grazing land and range forage is a perishable asset, and so there is a need to preserve that perishable asset so that it can be used by the proper permittees. The Oglala Sioux Tribe has an interest in defending the federal government's enforcement of livestock trespass laws. It also has an interest in preserving its sovereign immunity from unconsented suit. Well, can I ask you about, I just want to bring up the de jure point. It may not matter in the end if we get to the exhaustion point, but my understanding is that one of the employees on the tribal immunity that they sought to subpoena was no longer a tribal employee at that point. That's correct. And wouldn't it be an extension of de jure for us to say that tribal immunity extends to someone who is not an employee but was at one time? I think the federal government in the district court indicated that they would allow Denise Mesteth, she was the witness who was at the time of subpoena a federal employee, they would allow her to be deposed in her capacity as a federal employee about matters of which she had knowledge in the course of her work as a federal employee. She, in fact, had no knowledge relating to any impoundment in the Temple case, and so Temple did not seek to depose her despite the federal government making her available. So Temple sought to depose Mesteth and Provost in their capacity as current or former tribal officials in their official capacities regarding matters that they undertook or observed, actions they took or actions they observed, decisions that they observed, or took part in as tribal employees. They were subpoenaed in their official capacities, the district court found, and there's material in the record, Your Honor, about the subpoenas themselves and discussion with counsel about what it was that they sought, not just the documents, which the list speak for itself, but the subject areas that they sought to inquire, was to depose them in their official capacities while they were working as tribal officials. That's the question I have. I actually want to get at that. So did the tribe then oppose even the federal employee coming in and talking about what she did as a tribal employee? Yes, Your Honor. The tribe did move to quash the subpoena of Denise Mesteth. And that is what I want to get at, which is would that be an extension of dejority? I don't think so, because they were seeking to get testimony that she came into possession of or documents that she may, to be honest, Your Honor, she probably had no possession of documents once she was a federal employee, but whatever knowledge she had or testimony would have been in her official, it would have been acquired in her official capacity as a tribal employee. I do want to pick up on Judge Kelly's point that the subpoena issue is intertwined with the pre-impoundment issue. And so if the court finds the pre-impoundment claims were properly dismissed, or that Temple waived any claim to preserve the pre-impoundment claims, then the court may not need to reach the subpoena issue. I hear no argument from Mr. Temple that the subpoenas were related to anything other than the pre-impoundment claims. There are two reasons why Temple waived his pre-impoundment claims. First, he filed a federal administrative appeal of the issuance of permits to Buffington. He filed that, he got a decision from the regional director, he then appealed to the IBIA. He voluntarily dismissed that federal administrative challenge to the pre-impoundment claims, the pre-impoundment issuance of a permit to Buffington. Second, there's no evidence in the record that Temple exhausted his tribal court remedies by appealing the final tribal court decision to the tribal Supreme Court. He had an opportunity to show the district court that he had exhausted. He failed to do that. And so if the court doesn't reach the pre-impoundment claims, then it may not need to reach the subpoena issue. If you do reach it, though, Your Honors, we respectfully urge you to follow de jure. It is the controlling law of this circuit, and we believe it's on all fours. All right, does Ms. Hagee have any time left? All right, you have one ten, take two minutes on rebuttal. Thank you, Your Honor. Addressing the point of whether the cattle were identified or specifically marked in these compliance checks, notices of trespass, that's just not correct. The way these brands work is it's the same brand stamped on every cow in the pasture. These aren't tagged cattle with a specified number assigned to them. So when you see the notice of trespass, you'll see X number of cows were in X parcel. X number of cows were in this parcel. Does that matter, though? Because, I mean, there's been notice that some of the cows are trespassing, right? And maybe opposing counsel is wrong about this, but if they're only taking the trespassing cows, it's sort of like you've been warned, you still have trespassing cows. So it's kind of the second person or the second violation those cows end up suffering. They end up getting impounded. I mean, does that really matter if he's still ignoring the trespass notice? It does for procedural due process because the opportunity to respond that the BIA has afforded is only tied to that initial notice of trespass that here took place two months prior to the actual cattle that were impounded. This allows Mr. Temple to object as to certain legal reasons why maybe he should be allowed to have his cattle on that property. One, that he is the rightful holder of the grazing permit. Two, that the ownership of this land within the range unit itself allows him to graze there. But it doesn't allow him to address the actual circumstances of the impoundment at the time of seizure. And opposing counsel has simply not refuted that opportunity or any facts where they're giving you that opportunity to make those factual objections to the seizure that has taken place. In fact, counsel points to the factual findings made by the district court, which shows that eight years after the fact, those are the factual findings that are being supported and relied on for purposes of the seizure. The mere fact that this took eight years to get the hearing and that was initiated by Mr. Temple himself rather than part of the BIA's procedural due process in seizing that cattle is clear evidence of procedural due process violations. I see my time is up. Thank you, Your Honor. Thank you very much, counsel. And the case is submitted. We appreciate your arguments today. The Court will render a decision as soon as possible. You may stand aside.